JOSEPH BRITTO *v.* FRAM CORPORATION.

DECEMBER 21, 1961.

PRESENT: Condon, C. J., Roberts, Paolino and Powers, JJ.

POWERS, J. This is an original petition for workmen's compensation resulting from an occupational disease, toxic peripheral neuritis, arising out of and in the course of the petitioner's employment, connected therewith and referable thereto. The cause is before us on the petitioner's appeal from a final decree of the full commission reversing the decree of a single commissioner awarding compensation as claimed.

The petitioner entered the employ of the respondent in February 1946, assisting in the kit department or stock room. Sometime in 1947 he was transferred to the paint department where he appears to have worked without interruption until 1952 or 1953. His work therein brought him in contact with carbon tetrachloride and several other chemicals. It is uncontradicted that the fumes from these

chemicals occasionally cause nausea, which prompted him to ask for and obtain a transfer from the paint department. Later he returned for a short period but at the time he brought the instant petition he had been working for two years or more as a rotary pleater operator.

The record further discloses that as early as 1950 petitioner experienced difficulty with the fingers of his left hand, noticing a weakness in its grip. The impediment apparently worsened in time, becoming markedly serious in 1958. He consulted Dr. Joseph DeLuca who referred him to Dr. Barry B. Mongillo. The latter testified that he first saw petitioner on May 14, 1958 and had him admitted to the Rhode Island Hospital on May 20 for the purpose of having a cervical myelogram and to eliminate any question of a ruptured disc as well as for observation generally.

The hospital records disclose that the myelogram was performed by Dr. Julius Stoll and that the result was negative. Doctor Stoll's report dated May 31, 1958 stated, "Certainly has plexus lesion cause not readily apparent," and on that day petitioner was released from the hospital.

Doctor Mongillo admitted that he was uncertain what was wrong with petitioner on his admission to the hospital and had previously testified that petitioner thought he was troubled with arthritis.

It appears that following his discharge from the hospital petitioner returned to work on June 13, 1958. The respondent's records indicate that he was unemployed for two months in early 1959 because of "bursitis" in his right shoulder, but otherwise worked without interruption until March 14, 1960, when he ceased working because of the condition of his left arm, wrist and hand.

The petitioner testified that he then consulted Dr. F. Lenz who treated him until May 23, 1960, on which day petitioner attempted to return to work. He was considered unable to work by respondent's physician, Dr. Foster. The petitioner then consulted Dr. Stanley D. Simon on May 25,

1960, having been referred to the latter by Dr. Lenz. The instant petition was brought on May 27, 1960 and hearings were held thereon commencing June 15, 1960 and concluding in November of the same year.

Doctor Simon, an orthopedic surgeon, testified that he had examined petitioner who was suffering from a swollen left wrist with pain and weakness in the hand and inability to adduct the left fifth finger, together with a fibrillary twitching of the muscles of the left thumb. It was the doctor's opinion that petitioner's condition presented two separate and distinct entities. The first such he diagnosed as an "ulnar nerve palsy" which had been progressive and was directly related to the handling of chemicals incident to the nature of petitioner's work. The second he ascribed to a traumatic arthritis of the left wrist due to cystic degeneration of the carponavicular and a secondary traumatic arthritis of the radiocarpal joints.

Doctor Simon described the ulnar nerve as a sensory and a motor nerve. He testified, "It supplies the motor power to the distal end or the small muscles which have to do with fine movements. It sends all the motor supply to the small muscles that has to do with the fifth finger motions. It also controls the fine motions of the thumb." It was his opinion that petitioner was suffering from a lesion of the ulnar nerve, chemically inspired; that he was partially incapacitated; and that his incapacity resulted from exposure to carbon tetrachloride.

Doctor Wilfred Pickles, a neurosurgeon, testified that at respondent's request he had examined petitioner on June 24, 1960 and several times thereafter. He stated that he had referred petitioner to Dr. Horwitz for X rays and to Dr. Dwinelle for an electromyogram. Their findings were incorporated in Dr. Pickles' report, which became respondent's exhibit. Doctor Pickles testified that petitioner clinically appeared to be suffering from neuritis, but that such diagnosis was ruled out by the electromyographic studies "as

there is no evidence of lower motor neurone involvement. There isn't any involvement of the peripheral nerve. We are thus forced to the conclusion that the patient has some form of myositis. That is an inflammation or degeneration of muscle."

It was his personal diagnosis that petitioner was most likely suffering from "chronic polymyositis" which he described as "a collagen disease of unknown etiology." He recommended that a muscle biopsy be performed to confirm or disprove his diagnosis. Questioned by the commissioner Dr. Pickles agreed that apart from any question of compensation the biopsy should be performed in the interest of petitioner's health. Asked by the commissioner, "If it isn't polymyositis, then we've got to look further if the biopsy should be negative?" Dr. Pickles replied, "I would think so." Amplifying his answer the doctor added, "I don't,—I don't know what we'll do, I mean, unless make further studies on the nerves and be sure that is accurate, that there is no damage to the nerves. I think it will be worthwhile then, as I said, if you could establish peripheral nerve disfunction, you'd have a very nice case for carbon tetrachloride here. So I think the thing to do would be to get the biopsy and if that is negative, then make further tests on the nerves and make sure we are not interpretating that wrong."

The petitioner was asked if he would consent to having a muscle biopsy performed and on his agreeing to submit the hearing was recessed for that purpose.

When the hearing was reopened Dr. Pickles testified to the results of the biopsy. He stated that it showed no evidence of the collagen disease which he had suspected might be present and he then arranged with Dr. Dwinelle at Rhode Island Hospital for a Galvanic test, by way of exploring for a possible nerve injury. The latter test proved positive and after explaining why the electromyogram had proved negative Dr. Pickles concluded, "Well, on the basis

of the information now available, it agrees with the clinical impression that he has ulnar nerve deviation. Denervation of the muscles supplied by the ulnar nerve in the lower arm and in the absence of any other known cause and in the presence of a history of chronic exposure to carbon tetrachloride which is known to give peripheral neuritis, which this is, I think we have to assume it is due to the chronic exposure to carbon tetrachloride fumes."

The single commissioner found that petitioner was totally incapacitated from March 14, 1960 to August 9, 1960 and partially incapacitated thereafter; that the incapacity resulted from an occupational disease, "toxic peripheral neuritis of the left arm," arising out of and in the course of petitioner's employment, connected therewith and referable thereto; that the petition was brought within 24 months from the date of disablement; and that the average weekly wage was $63.20. He ordered compensation conformable to his findings together with reasonable medical and hospital bills and an expert witness fee for Dr. Simon. A decree was entered accordingly and respondent appealed therefrom to the full commission.

The full commission affirmed the findings of the single commissioner in every particular except the finding relating to the timeliness in bringing the petition. It reviewed the evidence and concluded that the petition was not brought within 24 months from the date of disablement, having determined that petitioner was disabled within the meaning of G .L. 1956, §28-34-4, on May 20, 1958. The respondent's appeal was sustained and a final decree was entered accordingly.

In his reasons of appeal petitioner has assigned a total of eleven grounds of error. We deem it necessary, however, to consider only his eighth reason, namely, that the finding by the full commission that the petition was not brought within 24 months of petitioner's disablement was against

the law, against the evidence, against the law, the evidence and the weight thereof.

In passing on the question of whether petitioner had made his claim within the period authorized by the applicable statute, the commission concluded that the petition was governed by G. L. 1956, §28-34-4. This section provides:

"Neither the employee nor his dependents shall be entitled to compensation for disability or death resulting from such occupational disease, unless such occupational disease is due to the nature of his employment and was contracted therein. The time limit for bringing suit under this section shall be twenty-four (24) months from the date of disablement and the date of contraction of the disease shall not be a limiting factor."

The commission in reviewing the evidence decided that petitioner was disabled on May 20, 1958. This was seven days and two years prior to the commencement of petitioner's claim for compensation. In reaching their decision the commission relied on *Rosa* v. *George A. Fuller Co.*, 74 R. I. 215, and *Menna* v. *Mathewson*, 48 R. I. 310.

We are in accord with the principles laid down in those cases but they are not applicable in the instant cause.

In its decision the commission took cognizance of the fact that §28-34-4 had been amended by P. L. 1960, chap. 94, which amended G. L. 1956, §28-35-57, by adding the following:

"The time for filing claims shall not begin to run in cases of latent or undiscovered physical or mental impairment due to injury including disease until (1) the person claiming benefits knew, or by exercise of reasonable diligence should have known, of the existence of such impairment and its casual [causal] relationship to his employment or (2) after disablement, whichever is later, provided, that in any such case in which indemnity benefits have been paid, the claimant's right to compensation is preserved without time limitation."

The commission, however, found, "In this case, the disability was apparent to the petitioner in May, 1958 so it

cannot be said to be latent or undiscovered." They apparently ignored, or attributed no significance to the words "and its [causal] relationship to his employment," thereby equating knowledge of his disability with knowledge that such disability arose out of and in the course of his employment. The legislature clearly distinguished between the fact of disability and the causal relationship thereof to employment by providing, "whichever is later." There is no evidence in the record that petitioner so much as suspected, much less had knowledge, that the condition from which he was suffering was directly attributable to his employment.

The respondent contends otherwise, however. It argues that Dr. Pickles in his testimony and in his report referred to the fact that in 1953 petitioner had been advised that he was suffering from "tenosynovitis." Furthermore it points out that Dr. Pickles in his report, in noting the 1953 diagnosis, had the notation "probably occupational." It does not appear, however, that this was ever made known to petitioner. Indeed Dr. Pickles' report, from which he testified, in referring to the 1953 diagnosis of tenosynovitis carries the comment, "that he should not do heavy lifting, and that he should be kept out of painting, temporarily, due to his stomach." It is reasonable to infer that the doctor, not identified, who diagnosed petitioner's condition as "tenosynovitis" in 1953, did not relate the condition of the hand and arm to working conditions prevailing in the paint shop. The suggestion that petitioner avoid work in the paint shop because of his stomach is consistent with petitioner's own testimony that about that time he was subject to spells of nausea.

The respondent further argues that in any event the amendment of 1960 was not available to petitioner for the reason that the statute, enacted subsequent to the incurring

of the disease, is substantive and not procedural. There is no merit in this contention. The amendment was not designed to create a new right. Rather the legislature intended to and did redefine the circumstances which would give rise to a right already existing.

Nor in our opinion is there merit in the contention that P. L. 1960, chap. 94, was not intended to amend §28-34-4. Prior to the enactment of the 1960 amendment, the time period for filing claims for compensation resulting from occupational diseases (§28-34-4) and for injuries (§28-35-57), penalized the incapacitated employee who had no reasonable knowledge that his incapacitating disease or injury was causally connected with his employment. The language employed by the legislature in the 1960 amendment clearly demonstrates that the legislature intended to remedy such circumstances in both instances. If the amendment were intended to affect only the provisions of §28-35-57, then the phrase "including disease" would be rendered meaningless because the time for bringing a suit for compensation resulting from an occupational disease was controlled only by §28-34-4.

We have held that in construing sections of an act and determining the legislative intent thereof, the reviewing court is required to consider every part of the statute and, if possible, to give effect to every word, clause and sentence thereof. *Probate Court* v. *McCormick,* 56 R. I. 308. Bearing in mind that rule of construction it is our opinion that the legislature intended to amend both §28-34-4 and §28-35-57 by P. L. 1960, chap. 94.

The word "casual" as it appears in P. L. 1960, chap. 94, was unquestionably intended by the legislature to be "causal" since any other conclusion would be untenable.

The petitioner's appeal is sustained, the decree appealed from is reversed, and the cause is remanded to the work-

men's compensation commission for entry of a decree in accordance with this opinion and for further proceedings.

*Abedon, Michaelson and Stanzler, Milton Stanzler, Richard A. Skolnik* for petitioner.

*Worrell and Hodge, Eldridge H. Henning, Jr.* for respondent.